C. W. Edwards v. Commissioner. Florence Shackelford Edwards v. Commissioner.
Edwards v. Commissioner
Docket Nos. 108880, 3161, 108881, 3160.
United States Tax Court
1944 Tax Ct. Memo LEXIS 80; 3 T.C.M. (CCH) 1098; T.C.M. (RIA) 44334; October 18, 1944
*80 1. Petitioners are husband and wife who report on the community property basis. The husband was a member and the manager of a partnership which was engaged in transporting oil by barges. In the taxable years the partnership agreed with a Louisiana oil corporation to transport certain quantities of crude oil for an agreed price per barrel. After the partnership had named its price the representative of the oil company insisted that certain commissions would have to be paid to a crude oil sales company which he claimed to be representing. By agreement these so-called commissions were added to the price which the partnership had already named. By certain inquiries made at the office of the oil company and elsewhere the partnership was convinced that the so-called commissions were being added to the price of transportation with the knowledge and consent of the oil company. The partnership did not pay the sales company until it first collected from the oil corporation. In its returns the partnership did not report as gross income that part of the amounts collected from the oil corporation which it paid out as commissions; neither did it claim the so-called commissions as deductions. The *81 respondent determined that the full amount collected should be included in the gross income of the partnership and that no deductions therefrom were allowable for the commissions paid. Held, that the partnership acted as a mere conduit for the transfer of the so-called commissions from the oil company to the sales company and the so-called commissions were not a part of petitioners' gross income and the action of the partnership in not including them in its income tax returns either as income or deductions was proper. 2. During 1939 the father of petitioner C. W. Edwards acted as a handy man around the office of the partnership and also made short trips with his car and for this assistance he was paid a certain sum by petitioner personally and was not carried as an employee of the partnership. Held, the amount so paid is not deductible as an ordinary and necessary business expense under section 23 (a), I.R.C., but is more in the nature of a personal expense, and, as such, is specifically non-deductible under section 24 (a), I.R.C.
Joyce Cox, Esq. and S. E. Wilcox, Jr., Esq., 2828 Gulf Bldg., Houston, Tex., for the petitioners. Homer J. Fisher, Esq. and James L. Backstrom, *82 Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion These proceedings which were consolidated involve deficiencies in income taxes for the calendar years 1939 and 1940 in amounts as follows: Petitioner
Docket No.
Year
Deficiency
C. W. Edwards
108880
1939
$3,781.90
Florence Shackelford
Edwards
108881
1939
3,781.90
C. W. Edwards
3161
1940
7,188.78
Florence Shackelford
Edwards
3160
1940
7,188.78
There is one main issue involved which is common to all the proceedings. It arises in the following manner. Petitioner C. W. Edwards is a partner in Edwards Transportation Company. This partnership, during its fiscal years ending January 31, 1939 and January 31, 1940, excluded from gross income certain sums collected from or accrued against Chalmette Petroleum Corporation by the partnership in connection with crude oil transportation contracts and which excluded sums were immediately paid out or accrued to Crude Oil Sales Company on commission contracts. The respondent determined that these sums collected from or accrued against Chalmette should be included in the gross income of the partnership and that no deduction from gross income should be *83 allowed for the sums paid out or accrued to the Sales Company. By appropriate assignments of error petitioners contest that determination. In his brief the respondent now concedes that so much of the sums accrued against Chalmette which were never collected because in the latter part of 1939 Chalmette took the position that none of the so-called commissions should be paid, should not be included in the gross income of the partnership. The amounts of these accruals are not in dispute. The respondent also determined that certain other adjustments should be made to the net income of the partnership for both years but these adjustments are not contested and will be given effect in a recomputation under Rule 50. For the year 1939 the respondent also determined that the net community income reported by petitioners should be increased by the disallowance of a deduction taken by the community of $1,375 representing an alleged salary paid by C. W. Edwards personally to his father. By appropriate assignments of error petitioners also contest that determination. Findings of Fact Petitioners reside in Houston, Texas, and are husband and wife. They filed their Federal income tax returns on *84 the community property basis with the Collector for the First District of Texas at Austin. In a statement attached to the deficiency notices in Docket Nos. 108880 and 108881 covering the year 1939, the respondent increased the net community income as disclosed by petitioners' returns by two adjustments, namely, (a) Partnership income $14,454.35; and (b) Salary $1,375. In this statement he explained these adjustments as follows: "(a) The net income of the Edwards Transportation Co., Houston, Texas, for the fiscal year ended January 31, 1939, has been determined to be $328,042.23, instead of $300,245.41 as originally reported on form 1065 filed for that year. The details of the adjustments made to the income of the partnership are fully set forth in the revenue agent's report dated June 3, 1940, a copy of which was furnished the Edwards Transportation Co. under date of July 26, 1940. By reason of the changes made to the partnership income your distributive share of the profits has been increased by $14,454.35, one-half of which is taxable to you and one-half to your wife, inasmuch as your returns were filed under the Community Property laws of the State of Texas. "(b) Amounts paid *85 for maintenance of aged father, which amounts were claimed as deductions, have been disallowed as it is held that such payments do not constitute proper deductions." In a statement attached to the deficiency notices in Docket Nos. 3160 and 3161 covering the year 1940, the respondent increased the net community income as disclosed by petitioners' returns by two adjustments which he designated as (a) and (b). Petitioners do not contest partnership adjustment (a). Adjustment (b) was explained as follows: Item (b) Gross Income
$42,900.68
The following payments made, or accrued, by the partnership to the Crude Oil Sales Company, New Orleans, Louisiana, are disallowed as deductions from gross income as same do not constitute allowable deductions within the meaning of the Revenue Code. The main business of C. W. Edwards sometimes referred to as "Edwards" is the "boat business" which his father started about 1885. In 1937 Edwards and William Helis of New Orleans, Louisiana, organized a partnership whose business was the transportation of crude oil by barges. Helis was in the oil producing business in Louisiana. The name of the partnership was Edwards Transportation Company, hereinafter *86 sometimes referred to as "the partnership". The partnership agreement was dated July 8, 1937. Among other things it provided that profits and losses are to be calculated from February 20, 1937; that Helis has contributed $100,000 in cash and Edwards $100,000 in operating equipment and cash; that each partner is to own 50 per cent of the business and shall participate in the net profits share and share alike; and that Edwards shall be the manager and shall receive a monthly salary therefor of four per cent of the net profits before deducting such salary. Helis has never concerned himself to any great extent with the management of the partnership. About a month or so before March 10, 1938, Joseph E. Loper, Sr. called at Edwards' office in Houston to see him about transporting crude oil for the Chalmette Petroleum Corporation, hereinafter sometimes referred to as "Chalmette". At that time the partnership had about all the business it could handle but Edwards told Loper the partnership might be interested in doing some of the hauling. They talked price a little but did not arrive at any set figure. The next contact was by telephone. Loper called Edwards from New Orleans and wanted to *87 know if Edwards would haul the oil for Chalmette. Edwards decided that the partnership would put in some additional equipment, a pump barge, and take the business. They then talked price some more. Edwards was trying to get as much as he could but he finally made a price for the proposed transportation of the crude oil of 12 cents a barrel from the Jennings, Louisiana oil fields to Chalmette's oil refinery in New Orleans. Loper then told Edwards that in addition to representing Chalmette he also represented the Crude Oil Sales Company, hereinafter sometimes referred to as the "Sales Co." and that the Sales Co. would have to get a commission of 3 cents a barrel out of the deal. Edwards asked who the Sales Co. was and Loper replied that he did not think it was any of his business, or words to that effect. Edwards then inquired if the commission was not for the officials of the Chalmette Company and Loper said "It could be that way." Loper said "I assure you it is all right, but you will have to pay the commission before you get the business." Edwards then told Loper very distinctly that if there was any commission to be paid, Chalmette would have to add it to the price of 12 cents; *88 that Edwards Transportation Company would have to have 12 cents a barrel net to them for hauling the oil. This telephone conversation ended without an agreement between the parties as Loper informed Edwards that Chalmette had not yet closed its deal for the oil in the Jennings field and that would have to occur before a contract for its transportation could be signed. Edwards was in New Orleans a few days later in connection with the regular business of the partnership and while there he tried to find out who the Sales Co. was. He went to his partner's office but Helis was not in. He then talked with George Helis, a brother to his partner and who was managing his partner's office. George told Edwards that the Sales Co. was a brokerage concern that did business in New Orleans for Chalmette and that William Helis (Edwards' partner) who was also buying oil on his own account paid the Sales Co. a brokerage on the business done through the Sales Co. Edwards then went to the office of Chalmette. The manager of Chalmette was D. B. Williams who was also a vice-president. Williams was not in and Edwards asked to talk with Loper, but Loper was also out. The office girl at Chalmette told Edwards *89 that Harold Williams who was sales manager for Chalmette would like to talk with him. Edwards then asked Harold Williams who the Sales Co. was and the reply was that it was a brokerage concern doing business for Chalmette. While they were talking the secretary-treasurer of Chalmette, R. P. Batson, came over and he assured Edwards that the Sales Co. was a brokerage company doing business for Chalmetter, and Edwards then went away convinced that was true. A short time thereafter, on March 10, 1938, the partnership simultaneously entered into two written contracts, one with Chalmette and one with the Sales Co. These contracts will sometimes hereafter be referred to as the 1938 contracts. Edwards signed both contracts for the partnership and D. B. Williams signed the contract for Chalmette. Among other things the contract with Chalmette provided: "We will move and you agree to permit us to move all of your requirements of Jenning's crude up to 3,000 barrels per day for the period of your crude oil contract with Superior Oil Company from Mar. 15th 1938 to Jan. 14th, 1939, from Glassell and Glassell Terminals on Bayou Des Cannes near Jennings, Louisiana to your Chalmette Refinery at New *90 Orleans, Louisiana for fifteen cents per barrel. * * * * *
"Payments are to be made on the destination gauges for the gross barrels transported and delivered. Payments shall be made on or before the 15th day of each calendar month for oil transported and delivered at final destination during the previous calendar month. "This agreement will become effective March 15th 1938 and remain in force until January 14th 1939." The contract with the Sales Co. was in the form of a letter signed by the partnership and addressed to the Sales Co., the body of which was as follows: "In consideration of your services in securing contract for us to transport crude oil requirements of the Chalmette Petroleum Corporation from Jennings Louisiana field to Chalmette, La., we agree to pay you a commission of Three (3) cents per barrel on all crude oil transported from this field to the Chalmette Petroleum Corporation during the life of said contract, from March 15th 1938 to January 14th 1939. Payments to be made to you promptly when payments are received by us for said transportation from the Chalmette Petroleum Corporation." Operating under these contracts, the partnership on March 23, 1938, loaded *91 18,227.83 barrels of crude oil at Jennings for transportation to New Orleans, and on March 29, 1938, it loaded another shipment of 11,228.97 barrels. The first shipment was delivered during March but the second shipment was not delivered until April. On the first shipment there was a shortage of 251.92 barrels and only 17,975.91 barrels were delivered. Under the partnership's contract with Chalmette payments were to be made on or before the fifteenth day of each month for oil transported "and delivered at final destination during the previous calendar month". The partnership, therefore, billed Chalmette for transporting and delivering 17,975.91 barrels at 15 cents per barrel and at the same time sent Chalmette a check for $539.27 as the commission of 3 cents per barrel on the 17,975.91 barrels. Batson, secretary-treasurer of Chalmette, then called Edwards on the telephone and told him that Chalmette should be billed for the oil actually shipped during the month; that the commission should also be based upon the oil actually shipped during the month; and that the check for the commission should be made out to the Sales Co. and not to Chalmette. Batson also told Edwards that he would *92 tear up the check for $539,27. As a result of this conversation the partnership sent a revised invoice to Chalmette for crude oil transported during the month of March 1938 in the amount of $4,418.52 representing the transportation of 29,456.80 barrels (18,227.83 plus 11,228.97) at 15 cents per barrel. On the same day the partnership issued a new check payable to the Sales Co. for $883.70 as representing the commission of 3 cents per barrel on 29,456.80 barrels. The payment of this amount was entered on the books of the partnership as a charge to income from oil transportation and was explained as being a "Rebate of 3 per Bbl." On or about April 10, 1938, the partnership's bookkeeper made a memorandum on the books of the partnership for future guidance based on information which he received from Edwards and from the contracts as follows: Contract Terms: Superior Oil Company to deliver thru Glassell and Glassell Terminals at Jennings on Bayou Des Cannes 2,500 bbls per day Rate Per Bbl - Bayou Des Cannes, Jennings, La. to Chalmette 15 billing to be on net bbls loaded. All oil to be billed in month in which it leaves the field. Refund of 3 per bbl to be paid to Crude *93 Oil Sales Company - 3333 State St. - New Orleans. Future billing to Chalmette and payments to the Sales Co. were as requested by Chalmette and as recorded in the above memorandum. The checks to the Sales Co. were drawn at the end of the month, held until check was received from Chalmette, and then mailed. On December 16, 1938, the partnership simultaneously entered into two written contracts, one with Chalmette and one with the Sales Co. Edwards signed both contracts for the partnership and D. B. Williams signed the contract for Chalmette. Among other things the contract with Chalmette provided: "We will move and you agree to permit us to move all of your requirements of Jennings crude up to 4,500 barrels per day for the period of your crude oil contract with the Evangeline Pipe Line Company, from their terminals on Bayou Nezipque near Jennings, Louisiana to your Chalmette Refinery at New Orleans, Louisiana for fourteen cents per barrel. * * * * *
"This agreement will become effective January 15, 1939 and remain in force until December 31, 1939, both dates inclusive." The contract with the Sales Co. was in the form of a letter signed by the partnership and addressed to the *94 Sales Co., the body of which was as follows: "In consideration of your services in securing contract for us to transport crude oil requirements of the Chalmette Petroleum Corporation from the Jennings, Louisiana field to Chalmette, La., we agree to pay you a commission of Four (4) cents per barrel on all crude oil transported from this field to the Chalmette Petroleum Corporation during the life of said contract, from Jan. 14th 1939 to January 14th 1940. "Payments to be made to you promptly when payments are received by us for said transportation from the Chalmette Petroleum Corporation." On December 22, 1938, the partnership simultaneously entered into two written contracts, one with Chalmette and one with the Sales Co. Edwards signed both contracts for the partnership and D. B. Williams signed the contract for Chalmette. Among other things the contract with Chalmette provided: "We will move and you agree to permit us to move all of your requirements of crude oil from the following points at the following rates and up to the following number of barrels from each point of loading. (1) Up to two thousand (2,000) barrels per day from Fohs Oil Company Storage at Pilgrim's Landing *95 to Chalmette Petroleum Corporation's Refinery at New Orleans, Louisiana at six (6) cents per barrel. (2) All of your requirements from Standard Oil Company of Louisiana Storage at Avondale, Louisiana to Chalmette Petroleum Corporation's Refinery at New Orleans, Louisiana at three (3) cents per barrel. (3) All of your requirements from Fohs Oil Company Terminals at Algiers, Louisiana to Chalmette Petroleum Corporation's Refinery at New Orleans, Louisiana at three (3) cents per barrel. * * * * *
"This agreement will become effective January 15, 1939 and remain in force through December 31, 1939. The contract with the Sales Co. was in the form of a letter signed by the partnership addressed to the Sales Co., the body of which was as follows: "In consideration of your services in securing contract for us to transport crude oil requirements of the Chalmette Petroleum Corporation from: Fohs Oil Company Storage at Pilgrim's Landing, La., Standard Oil Company of Louisiana Storage at Avondale, Louisiana, and Fohs Oil Company Terminals at Algiers, Louisiana, we agree to pay you a commission of one (1) cent per barrel on all crude oil transported from these points to Chalmette Petroleum *96 Corporation, New Orleans, Louisiana during the life of said contract, from January 15th, 1939 thru December 31st, 1939. Payments to be made to you promptly when payments are received by us for said transportation from the Chalmette Petroleum Corporation." The above contracts entered into on December 16 and December 22 were also negotiated between Loper for Chalmette and Edwards for the partnership, and will be sometimes hereafter referred to as the 1939 contracts. In the December 16, 1938 contract the parties first arrived at a price of 10 cents per barrel for the transportation, after which the 4 cents per barrel was added for the commission which Loper said was necessary in order to secure the contract. The December 22, 1938 contract was arrived at in the same manner except for the different figures. Loper resigned from Chalmette effective January 1, 1939. He opened up an office in the Canal Bank Building in New Orleans and had the words "Crude Oil Sales Company" placed on his office door. Prior to that time the address of the Sales Co. in New Orleans had been 3333 State Street Drive, which was also Loper's home address. At the time the contracts were entered into Edwards did *97 not know that the address of Loper and the Sales Co. were the same. On September 30, 1939, the partnership rendered Chalmette an invoice for 41,840.85 barrels of oil transported from Fohs Oil Company Storage at Pilgrim's Landing to the Chalmette Refinery at 6 cents per barrel, which amounted to $2,510.45. Chalmette paid this invoice on October 16, 1939. On September 30, 1939, the partnership also drew up Check No. 6890 for $418.41 which represented the commission of 1 cent per barrel on the 41,840.85 barrels and held it until October 16, 1939 when it was cancelled and never sent to the Sales Co. On October 31, 1939, the partnership rendered Chalmette two invoices for oil transported during that month. These were as follows: Invoice
Loading
Barrels
Number
Point
Transported
Price
Amount
306
Pilgrim's Landing
40,126.05
6 $ 2,407.56
307
Jennings
61,781.52
14 8,649.41
Total amount invoiced for October, 1939
$11,056.97
The commission on the oil transported for October 1939, computed under the December 1938 contracts, amounted to $2,872.52, computed as follows: 40,126.05 barrels at 1 per barrel
$ 401.26
61,781.52 barrels at 4 per barrel
2,471.26
$2,872.52
*98 As indicated later in these findings (in the letter to Cobb dated November 14, 1939) Chalmette only remitted $7,783.19 which represented the amount invoiced of $11,056.97, less the commissions of $2,872.52, and less an additional amount of $401.26 representing 1 cent per barrel on the oil shipped from Pilgrim's Landing. Chalmette also withheld an extra 1 cent per barrel on the oil shipped from Pilgrims' Landing during the months of November and December 1939, which amounted to $432.63 for November and $294.85 for December, so that taking into consideration the commissions on the September shipments withheld by the partnership of $418.41, Chalmette still owes the partnership a net amount of $710.33, computed as follows: Excess commissions withheld by Chal-
mette on October shipments
$ 401.26
Excess commissions withheld by Chal-
mette on November shipments
432.63
Excess commissions withheld by Chal-
mette on December shipments
294.85
Total excess commissions withheld
by Chalmette
$1,128.74
Less September commissions never
paid by partnership
418.41
Amount still owed partnership by
Chalmette
$ 710.33
On July 5, 1939, Chalmette's president, B. C. McClellan wrote the *99 partnership suggesting the 14 cent rate in the December 16, 1938 contract was too high, and should be reduced to 9 cents as of January 15, 1939. Shortly before this letter was received D. B. Williams called Edwards on the telephone and told him it was being written. Edwards told Williams of many difficulties, costs and irritations of performing the contract, ascribed by Edwards in large part to unreasonable attitudes and conduct, and inadequate equipment, of Chalmette. Williams said he had not known of these things; asked Edwards to set them out in his reply letter. Edwards told Williams that if Chalmette desired to reduce the rate, it should cut the Sales Co.'s commission. Williams replied that the Sales Co.'s money was spent before it was received and that there was no need even to discuss a reduction in the commissions. When the letter was received Edwards was in the hospital ill. He scribbled a reply which was transcribed at his office and brought to him at the hospital for signature. In it he discussed only the matters Williams said Chalmette did not know about and about which it wished information. The matter of the commissions which were being paid to the Sales Co. was not *100 discussed. There followed a request by Chalmette for a listing of the partnership's equipment which was complied with. In the latter part of 1939 Lloyd Cobb, a lawyer in the general practice in New Orleans who does work for William Helis, called Edwards and asked if he was paying commissions and on hearing the facts asked Edwards' permission to communicate them to Monte M. Lemann, attorney for Chalmette. Cobb stated he wished to do this for certain personal and professional reasons. Edwards gave the permission, stating Chalmette already knew of the matter. There followed an exchange of letters. Lemann wrote to Cobb on November 14, 1939, as follows: "Dear Mr. Cobb: "I am enclosing to you voucher check of Chalmette Petroleum Corporation to the order of Edwards Transportation Company for $7,783.19. This is calculated, as you will observe, at the rate of 10 per barrel on Jennings crude and 4 per barrel on Lake Long crude, and represents amount due for transportation of oil during October, 1939. This payment is made by Chalmette without prejudice to any of its rights against Edwards Transportation Company to recover from the latter "commissions" paid by Edwards Transportation Company *101 in the past to J. E. Loper doing business under the names of Petroleum Sales Company and Crude Oil Sales Company. "Please acknowledge receipt." Cobb, on Edwards' authority, replied as follows: "Dear Mr. Lemann: "We acknowledge receipt of yours of November 14th. "We see no reason why Chalmette Petroleum Corporation should not discontinue, at anytime it sees fit, the payment to Edwards Transportation Company of the amounts which it requested Edwards Transportation Company to receive and disburse in a specific manner. We are, accordingly, transmitting the check to Edwards Transportation Company with the suggestion that it accept it if it has been correctly calculated and we naturally assume such to be the case. "Although we do not believe any non-prejudice understanding to be necessary, we concur in your statement that the payment is both made and received without any prejudice whatever to the rights of either of our clients." Lemann then wrote Cobb for an explanation of the sentence in Cobb's letter beginning with "We see no reason why" whereupon Cobb replied that he did not know how to express more clearly the thought contained in that sentence which caused Lemann to write Cobb *102 as follows: "I have your letter of November 16th, which seems to be substantially as cryptic as your original communication. However, as our differences are being submitted to the courts, I presume in due time everything will be made plain to me." During the fiscal year ending January 31, 1939, the partnership collected from Chalmette as a part of the charge for transportation the amount of $21,943.03 which it immediately paid over to the Sales Co. During the fiscal year ending January 31, 1940, the partnership collected from Chalmette as a part of the charge for transportation the amount of $37,176.29 all of which, except the September 1939 commission of $418.41, it immediately paid over to the Sales Co. During the fiscal year ending January 31, 1940, the partnership also accrued against Chalmette for the months of October, November and December the total amount of $5,724.39 which amount was never paid by Chalmette to the partnership and which amount was never paid by the partnership to the Sales Co. The books of the partnership were kept on the accrual basis. On the partnership returns filed for the fiscal years ending January 31, 1939 and 1940 not any of the above-mentioned *103 commissions were reported as income by the partnership; neither were they taken as deductions. In determining the deficiencies here in question the respondent added the above-mentioned commissions to the income of the partnership but did not allow the partnership any deductions for the amounts it paid to the Sales Co., explaining his action as heretofore set out in these findings. Edwards never has known what the Sales Co. did with the commissions paid to it by the partnership. During March 1938 the "allowables" in oil production in the Jennings field were increased from 15,750 to 17,600 barrels per day. Neither the partnership nor C. W. Edwards had anything to do with securing this increase in "allowables". Issue No. 2. George M. Edwards, the father of petitioner C. W. Edwards, was a man of about 66 in 1939. The father was claimed as a dependent by the son on the latter's income tax returns for the taxable years 1937 and 1938. George M. Edwards had been in the tugboat, barge and boat business all of his life. C. W. Edwards desired to employ his father in the business of the partnership during 1939 but did not want to place him on the partnership payroll without first speaking *104 to his partner, which he never did. George M. Edwards remained around the office of the partnership during 1939. He would run errands with his car and was sort of a handy man about the office. C. W. Edwards personally paid him $1,375 during the year 1939 and claimed that amount as a deduction from the gross income of the community. The respondent disallowed the deduction and substituted therefor a dependency credit. Opinion BLACK, Judge: On the main issue petitioners contend that the commissions collected by the partnership from Chalmette and immediately paid over by the partnership to the Sales Co. were not a part of the partnership's gross income. As alternatives, petitioners contend that if it be held that the commissions are a part of the gross income of the partnership, then they are deductible from gross income either as ordinary and necessary business expenses or as losses. The respondent determined that the commissions were a part of the partnership's gross income and were in no ways deductible. The applicable sections of the Internal Revenue Code, as amended, are in the margin. [1]
*105 In support of petitioners' contention that the commissions were not a part of their gross income, they argue that as to such commissions the partnership must be regarded as a mere conduit or agency in collecting the commissions from Chalmette and paying them over to the Sales Co. They further argue that although the contracts between the partnership and Chalmette on the one hand, and between the partnership and the Sales Co. on the other hand took the "form" of a consideration paid by Chalmette to the partnership for transporting oil and of a consideration paid by the partnership to the Sales Co. for "your services in securing contract for us to transport crude oil" this must not be regarded as the "substance" of the transaction. That the real substance of the transaction was that the partnership had agreed to transport the oil for Chalmette at a flat rate per barrel without reference to the payment of commissions to anyone, and that the payment of the so-called commissions to Sales Co. by the partnership was a matter of form by which Chalmette paid over to Sales Co., through the intervention of the partnership, the amounts represented by the so-called commissions, the reasons for *106 doing so not being disclosed to the partnership. In ordinary business transactions the form represents the substance and there is no reason to reject the form. In the instant case we have in evidence for the fiscal year ending January 31, 1939, a contract between the partnership and Chalmette by which it was agreed that Chalmette should pay the partnership 15 cents per barrel for transporting its oil. We have also in evidence another contract by which the partnership agreed to pay the Sales Co. 3 cents per barrel of this 15 cents which it was to receive from Chalmette as compensation for Sales Co.'s services in procuring the contract. Certainly under ordinary circumstances the two contracts would be regarded as separate and the Commissioner would be correct in saying that the entire 15 cents per barrel which the partnership received from Chalmette would have to be included in the gross income of the partnership, and the 3 cents per barrel paid to Sales Co. by the partnership, if deductible, would have to be deducted as ordinary and necessary business expenses. But plainly, judging from the evidence which we have in the record, the two contracts of which we have spoken above were *107 not entered into in the ordinary manner. What happened in substance was this: The partnership was well and favorably known in the transportation of oil by boats and barges on the bayous and rivers of Louisiana. Chalmette had contracted to purchase crude oil from producers in the Jennings field and sent its representative, Loper, to the Houston, Texas, office of the partnership to negotiate a contract with it for the transportation of the oil. Loper did negotiate with Edwards and later Edwards, in a conversation over the telephone, named a price of 12 cents a barrel for transporting the oil. After Edwards had named this price Loper informed him that in order for the partnership to get the contract, it would have to pay the Sales Co., which he also alleged he represented, 3 cents per barrel. Edwards in effect said to Loper, "That is something I didn't figure when I named you the price of 12 per barrel. If Chalmette wants a commission of 3 per barrel paid to Sales Co. then that amount will have to be added to the 12 which I have named, and will make the price of transportation 15 per barrel instead of 12 which I first named". The contracts were thereafter entered into in the manner *108 which we have detailed in our findings of fact. What we have said as to the 1938 contracts applies with equal force to the 1939 contracts which were entered into. The partnership treated the so-called commissions paid to Sales Co. under these contracts on its books as refunds or rebates to Chalmette. When it filed its income tax returns for the two taxable years in question it did not report in its gross income so much of the money which it received from Chalmette as represented these so-called commissions, nor did it take such commissions as deductions in arriving at its net income. In other words, while having all these matters entered upon its books of account, it entirely omitted from its income tax returns, either as receipts or deductions, the amounts which it paid over to the Sales Co. under the contracts, treating them as rebates or refunds on the price for transportation originally agreed upon. It justifies this action upon the ground that it had no beneficial interest in the 3 cents per barrel which was added to the price for commissions to the Sales Co. under the 1938 contract, and none in the 4 cents per barrel and the 1 cent per barrel which were added for the same purpose *109 to the 1939 contracts; that it was a mere conduit for these payments and should not be required to return them as gross income. Sec. 17.12, Vol. 2, Mertens Law of Federal Income Taxation, under the title of "Persons Serving as Conduits", says in part: There are many instances in which the legal relation of principal and agent may not exist, but the same taxable consequences may result. Where the recipient of income is serving merely as a conduit or transmitter of such income, he is not liable for tax on such income. The purpose of the income tax laws is to tax income to the person who has the right or beneficial interest therein, and not to throw the burden on a mere conduit, collector, or innocent agent. The tax is laid only on what is received for one's own benefit. * * * Certain cases are cited by the author in support of these statements. In the instant case if Edwards, representing the partnership, had gone to Sales Co. and said to its representative, Loper, "We are in need of business and will pay you a commission of 3 cents per barrel for securing the business for us" and the subsequent contracts had been executed under those circumstances, there could be no question but *110 that all the partnership received under the contracts thus negotiated would have to go into its gross income, and a deduction for the commission would have to be claimed under the section of the statute which provides for the deduction of ordinary and necessary business expenses. But as we have already explained, the transactions did not take place in that manner, but in a manner, although bearing the form of commissions, were in substance conduit payments to Sales Co. by Chalmette for some purpose which is not disclosed in the record which we have before us. Edwards' testimony is to the effect that the payments were actually made to Sales Co. as the partnership agreed; that he satisfied his own mind by some inquiry and research, that the commissions were being paid to Sales Co. with Chalmette's knowledge and consent, and that he had no knowledge at the time the payments were made, and still has none, as to what the money was used for. All he knows is that it was paid over to Sales Co., and that Chalmette knew about it. Loper did not testify nor did any officer of Chalmette. Therefore we are left in the dark as to what ultimately became of this money, except that the checks were deposited *111 in New Orleans banks to the credit of Crude Oil Sales Company, and that Loper alone had the right to check on these accounts. The checks paid by the partnership to the Sales Co. bore the endorsement of the "Crude Oil Sales Company" but not of Loper or any officer of Chalmette. Whether proper business ethics should have laid upon Edwards, as representative of the partnership, a greater burden than he actually exercised of ferreting out who the Sales Co. was, what it was doing with the money, and what if any relationship it bore to Chalmette, it seems to us is not a matter which we are called upon to decide in this proceeding. Respondent does not dispute that the partnership paid over the amounts which it claims to Sales Co., and makes no contention that the partnership in any way ever received any of this money back. It is clear to us that it received no economic benefits from the amounts represented by such payments but that it was a mere conduit used to transmit such payments from Chalmette to Sales Co. We therefore sustain petitioners' main contention that the amounts in question should not be added to the net income of the partnership as reported on its income tax returns for *112 the taxable years. Cf. Bettendorf v. Commissioner, 49 Fed. (2d) 173. Mark D. Eagleton, 35 B.T.A. 551, affd. on other points 97 Fed. (2) 62. The substance of respondent's contention in his brief is that the total payments which the partnership received from Chalmette during the two taxable years in question should go into its gross income for taxation, and that it should not be allowed to deduct the so-called commissions which it paid over to Sales Co. as "ordinary and necessary" business expenses. Respondent concedes that the payments were necessary on the part of the partnership in that the facts show that it could not have obtained the business without making such payments, but respondent denies that such payments under the evidence were "ordinary" as used in the statute and are therefore not allowable deductions under the rationale of the Supreme Court's decision in Welch v. Helvering, 290 U.S. 111, and Deputy v. Du Pont, 308 U.S. 488. We have already sustained petitioners' primary contention that these so-called commissions *113 were collected and paid over to Sales Co. in such a manner, and under such circumstances, as to make the partnership a mere conduit for their collection and payment, and should not be included as a part of its gross income. It, therefore, becomes unnecessary to consider and pass upon the respective contentions of petitioner and respondent as to the deductibility of these payments as ordinary and necessary business expenses. Issue No. 2. The question here is whether the community is entitled to deduct from its gross income as an ordinary and necessary business expense the amount of $1,375 which petitioner C. W. Edwards personally paid to his father in 1939 for being a handy man about the office of the partnership. He was not carried on the rolls as an employee of the partnership. In fact, petitioner seems to concede that he was not an employee of the partnership. We think the amount paid to George M. Edwards during 1939 by his son was more in the nature of a personal expense. Section 24 of the Internal Revenue Code provides that "In computing net income no deductions shall in any case be allowed in respect of - (1) Personal, living, or family expenses * * *." We sustain the respondent's *114 determination upon this issue. Cf. James D. Robinson, 45 B.T.A. 39. Decisions will be entered under Rule 50.
Footnotes
1. SEC. 22. GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * * SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * * * * * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business; or * * *↩